BARBARA J. PARKER, City Attorney – SBN 069722
OTIS McGEE, JR., Chief Asst. City Attorney – SBN 071885
DAVID A. PEREDA, Supervising Deputy City Attorney – SBN 237982
One Frank H. Ogawa Plaza, 6th Floor
Oakland, California  94612
Telephone:  (510) 238-4921 (Pereda), Fax:  (510) 238-6500

Attorneys for Defendants
CITY OF OAKLAND, et al.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANA BIOCINI, et al., | Case No.  C 14-3315-TEH |
| Plaintiffs, | **RESPONSE TO PLAINTIFFS' MOTION TO SET ASIDE SETTLEMENT AGREEMENT** |
| v. | |
| CITY OF OAKLAND, et al. | Date:  April 4, 2016<br>Time: 10:00 a.m.<br>Place: Courtroom 2, 17th Floor<br>Judge: Hon. Thelton E. Henderson |
| Defendants. | |
| | Additional Documents:<br><br>▪ David Pereda's declaration<br>▪ Exhibits 1-7 |

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES**..................................................................................ii

**ISSUES TO BE DECIDED** ...............................................................................1

**INTRODUCTION** ...........................................................................................2

**BACKGROUND** .............................................................................................3

    A. Oakland Police Officers' Response To Biocini's 911 Call ...............................3

       ▪ Biocini's frantic 911 call......................................................................3

       ▪ Responding officers first found Biocini in a window sill at
the side of the house.............................................................................4

       ▪ The officers secured Biocini's safety and began clearing the house. ...............5

       ▪ Biocini was too scared to tell the officers that she was mistaken. ..................6

       ▪ Jaramillo blocked the officers' efforts to investigate. ......................................6

       ▪ The officers immediately called for medical aid...............................................6

       ▪ Incident timeline .................................................................................9

    B. Jaramillo Had An Unhealthy Heart ...............................................................9

    C. The City Turned Over All Its Files Early On In The Case ............................10

    D. After Two Settlement Conferences, The Parties Reached An Agreement.....10

    E. Weeks Later, Biocini Changed Her Mind .....................................................13

**DISCUSSION** ................................................................................................14

    I. THERE IS NO SOURCE OF JURISDICTION ..................................................15

    II. THERE IS NO FRAUD OR MANIFEST INJUSTICE......................................15

    A. The Is No Evidence Of Fraud........................................................................16

       1. There was no fraud during the settlement conferences...........................16

       2. The City withheld nothing ....................................................................16

    B. There Are No Extraordinary Circumstances.................................................17

    III. THERE IS A VALID SETTLEMENT AGREEMENT.......................................18

**CONCLUSION** ..............................................................................................19

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Adams v. Johns-Manville Corp.*
876 F.2d 702 (9th Cir. 1989)..............................................................................18

*Arata v. Nu Skin Int'l, Inc.*
96 F.3d 1265 (9th Cir. 1996)..............................................................................15

*Decanay v. Mendoza*
573 F.2d 1075 (9th Cir. 1978) ...........................................................................18

*Fennell v. TLB Kent Co. v. TLB Kent*
865 F.3d 498 (2nd Cir. 1989)............................................................................18

*Hagestad v. Tragesser*
49 F.3d 1430 (9th Cir. 1995)..............................................................................15

*In re M/V Peacock on Complaint of Edwards*
809 F.2d 1403 (9th Cir. 1987) ...........................................................................16

*Keeling v. Sheet Metal Workers' Int'l Ass'n*
937 F.3d 408 (9th Cir. 1991)........................................................................15, 17

*Kokkanen v. Guardian Life Ins. Co. of America*
511 US 375 (1995)..............................................................................................15

*Larson v. Heritage Square Assocs.*
985 F.2d 1533 (8th Cir. 1992) ...........................................................................18

*MidSouth Towing Co. v. Har-Win, Inc.*
733 F.2d 386 (5th Cir. 1984)..............................................................................18

*Moore v. Beaufort County*
936 F.2d 159 (4th Cir. 1991)..............................................................................18

*O'Connor v. Colvin*
70 F.3d 530 (9th Cir. 1995).................................................................................15

*U.S. v. Alpine Land & Reservoir Co.*
984 F.2d 1047......................................................................................................17

*Wang Laboratories v. Applied Computer Sciences, Inc.*
958 F.2d 355 (Fed. Cir. 1992)............................................................................19

**STATE CASES**

*Cahuenga Partners, LLC v. Turmeko Properties, Inc.*
176 Cal.App.4th 139 (2009) ...............................................................................19

*Elyaoudayan v. Hoffman*
104 Cal.App.4th 1421 (2003) .............................................................................18

*Folsom v. Butte County Ass'n of Governments*
32 Cal.3d 668 (1982)........................................................................15

*Levy v. Super. Ct.*
10 Cal.4th 578 (1995) ......................................................................18

*Richardson v. Richardson*
180 Cal.App.3d 91 (1986) ...............................................................19

*Roth v. Morton's Chef Services, Inc.*
173 Cal.App.3d 380 (1985) .............................................................15


**FEDERAL STATUTES**

Fed. R. Civ. P. 60 ............................................................................16


**STATE STATUTES**

Cal. Civ. Code § 1550......................................................................18

Cal. C.C.P. § 664.6..........................................................................14


**TREATISES**

Wallace Tashima, et al., *Civil Prac. Guide: Fed. Civ. Pro. Before Trial*
§ 15:141.17 (Rutter Group 2015).....................................................15

**RESPONSE TO PLAINTIFFS' MOTION TO SET ASIDE SETTLEMENT AGREEMENT** (C 14-3315-TEH)

# QUESTIONS PRESENTED

(1) Given that the Court dismissed Biocini's case with prejudice, is there a brand-new source of federal jurisdiction over her motion to rescind the settlement agreement?

(2) If the Court morphs the motion into a Rule 60 motion to set aside the dismissal—even though Biocini mentions that statute nowhere in her brief—did fraud yield the court-negotiated settlement? Or, are there *extraordinary circumstances* that make the settlement *manifestly unjust*?

## INTRODUCTION

This has to do with a change of heart about a fair, court-brokered settlement. The parties came to terms after many months of discovery, negotiation, and reflection. Weeks later, Ana Biocini began to double back. To begin with, Biocini is in the wrong court. Because this Court dismissed the case with prejudice, there is no jurisdiction over Biocini's motion to rescind the agreement.

Biocini never mentions Rule 60. But even if this Court treats Biocini's motion as a Rule 60 motion to set aside the dismissal, there is no proof of fraud or injustice. Far from it, four of Biocini's siblings stand by the agreement. Biocini and her two siblings who second guess it claim that video footage suddenly came to light, and that even though they "communicated . . . their satisfaction with the terms of the settlement," they wanted to hear if their brothers in Bogota were on board—they were and remain so. Biocini also feels that she deserves more money. In truth, the family had the footage all along. And the record, at bottom, evinces that there is a binding agreement.

The City empathizes with the family for its tragic loss. At the same time, the evidence in this case firmly establishes that the City's officers acted with due care and respect for Hernan Jaramillo's rights. From both standpoints, the City made sure to turn over all its records—including all video footage—early on in the case. Indeed, at her deposition, Biocini testified that she watched the footage; the family even attached the footage to one of its briefs. And there was more discovery. The family cross-examined key witnesses and hired experts to weigh in. In short, no evidence sat in the dark.

Meanwhile, a Magistrate Judge—whom the family chose—led two daylong settlement conferences. The parties broke from the first so that the family could take more time to vet the evidence and to weigh the options. The second one took place eighteen months after the family first sued. All parties appeared. Flanked by two lawyers, each sibling agreed to settle. Biocini herself put it on the record. Then once news media took an interest in the settlement, Biocini began to walk back.

This scenario is not a magic eraser for a federal court judgment. The City honored its

part, making payment. A court-negotiated resolution is not a lottery wheel of unpredictable outcomes. Rather, it is a binding conclusion.

# BACKGROUND

### A.    Oakland Police Officers' Response To Biocini's 911 Call.

For the Court's convenience, in this section the City restates the facts (the next section starts at page nine). Most core facts are undisputed.[1]

### Biocini's frantic 911 call.

On July 8, 2013, at 1:41 a.m., Biocini called 911.[2] She pleaded: "Police, please, come to my place . . . there is some people here and they just came trying to kill us."[3] "Come quickly, please. Come quickly. Somebody's here. Please. Please."[4]

Biocini told the operator that she heard "screaming," "a lot of noises," and "fighting."[5] She heard voices besides her brother's, she said.[6] Biocini never described her brother to the operator.[7]

Biocini was terrified.[8] So much so, that she never left her room to look into the noises or to check on her brother.[9] She thought that someone was going to kill her.[10] All the commotion woke up at least one neighbor.[11]

---

[1] *See* Reply in Support of Partial MSJ, 2-3. **Dkt. No. 41**.
[2] Ex. A, CAD Purge (attached to E. Oliver MSJ Decl.).—**Exhibits A-R appear at Dkt. No. 35**.
[3] Ex. C, 911 Call Tr., 1:4-8, 2:14-20; *see also* Ex B, City00033, 911 Recording (attached to E. Oliver Decl.); Ex. H, Biocini Depo., 98:20-99:10 (authenticating 911 Call) (attached to D. Pereda Decl.).
[4] *Id.*
[5] *Id.* at 2:11-3:21.
[6] *Id.* at 6:1-13
[7] Ex. H, Biocini Depo., 100:7-14 (attached to D. Pereda MSJ Decl.).
[8] *Id.* at 99:25-100:3, 100:18-24.
[9] *Id.* at 98:9-19.
[10] *Id.*
[11] Ex. P, M. Medina Depo., 32:23-25, 43:16-24 (attached to D. Pereda MSJ Decl.).

RESPONSE TO PLAINTIFFS' MOTION TO SET ASIDE SETTLEMENT AGREEMENT (C 14-3315-TEH)

**Responding officers first found Biocini at a window sill at the side of the house.**

Dispatch put out the details of the call and requested a Spanish-speaking officer.[12] Officer Navarro, a Latino, bilingual officer who grew up in Oakland,[13] responded first. As he walked alone from his car toward the house, he shined light into the parked cars, looking for potential suspects or witnesses.[14] He saw no one.[15] He also scanned the house for signs of a break-in.[16] Still approaching Biocini's house, Officer Navarro heard Biocini crying for help.[17] He followed the sound of her voice until he found Biocini calling out to him through a window at the side of the house.[18]

Officer Navarro wanted to help Biocini climb down through the window.[19] He was worried, though, that she might get hurt.[20] At this point, Officer Anderson arrived.[21] He whistled to alert Officer Navarro that he was approaching.[22] Moments earlier, he learned that there was a history of 911 calls from that residence: a family disturbance, "hang-ups," and a reported robbery.[23]

Both officers saw that Biocini was terrified.[24] She told the officers that an intruder was right outside her bedroom door.[25] The officers' immediate goals were to "get in there as quickly as possible to help the lady out."[26] Biocini threw house keys to the officers and said to use the front door.[27] The officers told her to stay put.[28]

---

[12] Ex. A, CAD Purge.
[13] C. Navarro Decl., ¶1.
[14] Ex. E, Navarro Depo., 25:20-26:3 (attached to D. Pereda MSJ Decl.).
[15] *Id.*
[16] *Id.* at 26:7-24, 27:7-16, 28:3-20.
[17] *Id.*
[18] *Id.*
[19] Ex. E, Navarro Depo., 35:4-24.
[20] *Id.*
[21] Ex. F, Anderson Depo. at 51:2-8, 17-24; 53:25-55:8 (attached to D. Pereda MSJ Decl.).
[22] *Id.*
[23] Ex. F, Anderson Depo., 44: 19-22, 45:15-46:18; Ex. B, City00034, Patrol 1 Radio, 05:00-05:55 (attached to E. Oliver MSJ Decl.).
[24] Ex. A, Navarro Depo. 32:5-33:1; Ex. F, Anderson Depo., 58:18-59:6; Ex. H, Biocini 100:22-101:4.
[25] Ex. F, Anderson Depo., 56:18-57:4.
[26] Ex. E, Navarro Depo., 39:1-20.
[27] *Id.* at 35:25-36:4.
[28] *Id.* at 39:1-20.

RESPONSE TO PLAINTIFFS' MOTION TO SET ASIDE SETTLEMENT AGREEMENT (C 14-3315-TEH)

**The officers secured Biocini's safety and began clearing the house.**

Officers Navarro and Anderson opened the front door and announced themselves.[29] All the lights were off.[30] The officers began systematically checking the rooms.[31] The house was small with a shallow hallway leading to the bedrooms.[32] Standing at one end of the hallway, the officers saw a door open at the other end.[33] It was Biocini.[34]

When the officers went to her room, she pointed to another door close by.[35] In her own words, Biocini was very frightened and in "shock."[36] Officer Navarro was put on even higher guard by noises coming from the room, "like stuff falling . . . like a dresser hit the floor."[37] On high alert, the officers knocked on that door while saying: "Oakland Police Department, open the door."[38] No one answered.[39] This happened about three times.[40] A voice on the other end repeated: "in a minute."[41] By this time, Officer Stout had arrived and was entering the house.[42]

Finally, a man cracked open the door.[43] The officers told the man to open the door all the way, but he would not do so.[44] The man tried to close the door on the officers.[45] Officer Anderson reached in to take hold of the man's wrist.[46] The officers attempted to take control of the man, who resisted.[47]

---

[29] Ex. E, Navarro Depo., 40:2-43:4.
[30] Ex. F, Anderson Depo., 61:1-16.
[31] Ex. E, Navarro Depo., 40:2-43:4.
[32] Ex. G, Stout Depo., 41:13-23 (attached to D. Pereda MSJ Decl.); *see also* Ex. Q, Interior Photographs (attached to D. Pereda MSJ Decl.); Ex. H, Biocini Depo., 147:17-149:6 (authenticating photographs).
[33] Navarro Depo., 43:5-25.
[34] *Id.*
[35] Ex. E, Navarro Depo., 45:10-25, Ex. F, Anderson Depo. 64:24-65:4.
[36] Ex. H, Biocini Depo., 105:25-106:5.
[37] Ex. E, Navarro Depo., 46:12-47:8.
[38] Ex. H, Biocini Depo. 106:6-9; Ex. E, Navarro Depo., 46:16-48:21; Ex. F, Anderson Depo., 66:19-68:15, 70:23-71:18.
[39] *Id.*
[40] *Id.*
[41] *Id.*
[42] Ex. G, Stout Depo., 37:3-9.
[43] Ex. E, Navarro Depo., 46:16-48:21; Ex. F, Anderson Depo., 66:19-68:15, 70:23-71:18.
[44] *Id.*; Ex. G, Stout Depo. 42:23-44:21, 46:4-47:18.
[45] Ex., E, Nacarro Depo., 52:20-53:3
[46] Ex. G, Stout Depo., 51:5-53:12
[47] *Id.*

Once the man was handcuffed, the officers elected to walk him out of the confined interior of the house.[48] The officers still needed to clear the house and to investigate whether there was an intruder, whether any violence had taken place, what was really terrifying Biocini, and why the man was avoiding contact with the officers.[49] The man did not easily go with the officers; instead, he intermittently dug in his heels.[50] Officer Navarro smelled alcohol on the man's breath.[51]

### Biocini was too scared to tell the officers that she was mistaken.

When Biocini saw the unidentified man with the officers inside the house, she remained visibly frightened.[52] In hindsight, Biocini testified that she "realized that what [she] thought had been happening didn't."[53] But *she never told the officers that nothing was wrong* because she "didn't know what to say."[54]

### Jaramillo blocked the officers' efforts to investigate.

The officers were compelled to investigate. To gain control of the scene and to continue with their investigation, the officers repeatedly asked Jaramillo to sit in a patrol car.[55] The officers explained to Jaramillo that he was not under arrest and that they needed to investigate.[56] Trying to put him at ease, the officers offered the olive branch of keeping his feet outside the car.[57]

Despite being asked no fewer than twenty times to sit in the car, Jaramillo refused to comply.[58] Officer Stout walked away for a moment to check on Biocini, who was also

---

[48] Ex. F, Anderson Depo., 82:8-24, 86:2-12; Ex. E, Navarro Depo., 59:6-23, 64:10-20.
[49] *Id.*
[50] Ex. F, Anderson Depo., 86:18-23; Ex. G, Stout 54:12-55:19.
[51] Ex. E, Navarro Depo., 60:16-22.
[52] Ex. H, Biocini Depo. 110:10-13; Ex. F, Anderson Depo., 74:6-24, 76:11-77:3; Ex. G, Stout Depo, 50:4-5.
[53] Ex. H, Biocini Depo., 108:6-24.
[54] *Id.*
[55] Ex. I, Navarro PDRD Tr., 2:2-6:11 (attached to D. Pereda MSJ Decl.); Ex. D, City1650, PDRD.
[56] *Id.*
[57] *Id.*
[58] *Id.*

outside.[59]  She was still very frightened.[60]  And Jaramillo was preventing the officers from getting to the bottom of the 911 call.[61]  All this was captured by a body camera.[62]

Unable to convince Jaramillo to comply, Officer Anderson finally tried to push him into the car, but he combatted this attempt.[63]  Officer Anderson next tried to distract Jaramillo by bearing down once on his foot.[64]  Jaramillo then wrapped his legs around Officer Anderson's legs.[65]  Jaramillo slipped a handcuff and swung his arms.[66]  Officer Anderson used a leg sweep to take Jaramillo to the ground to try to reapply the handcuffs.[67]

Once on the ground, Jaramillo kept resisting and thus stalling the officers' investigation.[68]  Jaramillo, who was facedown, turtled his arm between his body and the ground.[69]  The officers grabbed Jaramillo's arms and put him back in handcuffs.[70]  There is a dispute as to whether an officer at some point placed a knee on Jaramillo's back.  The PDRD footage never shows an officer doing so.[71]  Nor does it show any onlooker ever protesting how the officers treated Jaramillo.[72]  Each officer denies placing a knee on Jaramillo's back.  Also, the medical examiner found no bruise on Jaramillo's back.[73]

### The officers immediately called for medical aid.

Once handcuffed, Jaramillo began yelling that he "could not breathe," that he was "losing his air," and that the officers were "killing him right now."[74]  All along, the officers

---

[59] Ex. Stout Depo., 58:9-16.
[60] *Id.*
[61] *Id.*; Ex. E, Navarro Depo., 67:3-20, 73:22-74:4.
[62] Ex. D, City1650, PDRD (attached to Navarro MSJ Decl.)(*See also* Buller Decl. re video enhancement)
[63] Ex. F, Anderson Depo., 94:17-95:25.
[64] *Id.*
[65] *Id.*
[66] Ex. F, Anderson Depo., 96:16-97:1. 97:25-98:22; Stout Depo. 64:21-70:11; Navarro Depo. 78:13-80:13, 82:6-24.
[67] *Id.*
[68] *Id.*
[69] *Id.*
[70] *Id.*
[71] *See e.g.,* Ex. D, City1651
[72] Ex. D, City1647-City1651.
[73] Ex. J, Rogers Depo. 11:10-18, 28:1-11.
[74] Ex. D, City1651, 00:13-03:30

calmly encouraged Jaramillo to relax.[75]  The officers summoned a medical team since there had been a struggle during which the officers used some force.[76]

Besides that, the officers reasonably believed that Jaramillo needed a mental-health check.[77]  In the officers' eyes, Jaramillo showed signs of being mentally disturbed or impaired.[78]  Also, one of the neighbors told the officers that Jaramillo had a drug problem.[79] Before the struggle, Jaramillo kept telling the officers that he hit himself in the head and that he had been drinking.[80]  Given the volatile nature of the 911 call and Jaramillo's odd behavior, the officers could not simply leave Jaramillo in the house.[81]

Eventually, Jaramillo stopped yelling.  Concerned about agitating Jaramillo, the officers did not force him to sit up.[82]  The officers monitored Jaramillo's breathing by watching his back rise and fall.[83]

EMTs arrived and began assessing Jaramillo.[84]  He still had a pulse.[85]  Concerned for Jaramillo, Officers Navarro and Stout stayed close to him and assisted the EMTs.[86]

---

[75] *Id.; see e.g.* Ex. D, City1651 at 00:06-04:44.
[76] Ex. G, Stout Depo., 92:22-25, Ex. A, CAD Purge
[77] Ex. E, Navarro Depo. 90:15-91:2, 98:19-23, 99:4-100:3; Ex. G, Stout Depo., 74:19-75:12.
[78] Ex. G, Stout Depo., 87:23-89:22, 92:13-21.
[79] Ex. G, Stout Depo., 89:1-22; Ex. D, City1649, 1:06 and City1648, 20:34
[80] Ex. E, Navarro Depo. 90:15-91:2, 98:19-23, 99:4-100:3; Ex. I, Navarro PDRD Tr. 3:25-4:14, 6:4-5, Ex. D, City1650, PDRD.
[81] Ex. G, Stout Depo., 87:23-89:22, 92:13-21.
[82] Ex. G, Stout Depo., 74:19-75:12, 104:25-106:1.
[83] Stout Depo. 79:17-22; Navarro Depo., 86:23-87:12, 88:24-89:6.
[84] Ex. O, Paramedics Plus Report, 2.
[85] Ex. D, City1651, PDRD, 11:56-12:05
[86] Ex. D, City1647, PDRD, 04:48, 09:01-11:30 (showing Officer Navarro providing CPR).

### Incident timeline.

This table gives a snapshot of key points during the incident:

| Time | Event |
| --- | --- |
| 1:41 a.m. | Biocini called 911.[87] |
| 1:55 a.m. | Biocini tossed the officers keys through a side window.[88] |
| 2:05 a.m. | The officers were still trying to talk Jaramillo into sitting in a patrol car so that the officers could investigate.[89] |
| 2:09 a.m. | Officers summoned medical aid.[90] |
| 2:12 a.m. | Jaramillo stopped yelling.[91] |
| 2:19 a.m. | EMTs were assessing Jaramillo.[92] |

## B.    Jaramillo Had An Unhealthy Heart.

A county medical examiner found that Jaramillo died of "multiple drug intoxication associated with physical exertion."[93]   The main drug was cocaine.   Toxicological testing shows that Jaramillo ingested a potentially lethal dose.[94]   Jaramillo's left anterior descending coronary artery had two life-threatening, eighty-percent blockages.[95]   Also, Jaramillo had a history of using cocaine,[96] which took a heavy toll on his heart.[97]   In short, Jaramillo stood at risk for sudden death, especially after he ingested cocaine.

On the other hand, there is no support for the theory that Jaramillo died of positional

---

[87] Ex. A, CAD Purge
[88] *Id.*
[89] This time is determined by cross referencing "3L15 Code 6 to Maple" at 2:04 a.m. on the time-stamped Patrol 1 Radio Recording (Ex. B, City00034) with when that dispatch is heard on Officer Navarro's PDRD footage (Ex. D, 1650, PDRD).
[90] Ex. A, CAD Purge
[91] This time is determined by using the recording time on Officer Navarro's PDRD footage after cross referencing "3L15 Code 6 to Maple" with a time-stamped radio recording—see Fn. 92.
[92] Ex. O, Paramedics Plus Report, 2.
[93] Ex. J, Rogers Depo., 40:19-24.
[94] *Id.* at 20:4-21:9, 50:25-51:10.
[95] at 29:18-30:16.
[96] Ex. 3, Biocini Depo. 143:4-9 (attached to Pereda Decl.).  **Dkt. No. 54.**
[97] Ex. 6, Micrographic slides depicting myocardial remodeling (attached to Pereda Decl.).  **Dkt. No. 54.**

asphyxia.  For one thing, peer-reviewed science—including an epidemiologic study[98]—disproves the myth that merely laying prone impedes breathing.  Also, there was no bruising on Jaramillo's back.[99]

### C. The City Turned Over All Its Files Early On In The Case.

In December 2014, the City produced all its records in this case.[100]  The City took care to bates stamp and index everything for the family.[101]  This was to ensure transparency and to help answer the important questions that the family had about Jaramillo's tragic death.[102]  At her deposition in September 2015, Biocini testified that "[a]s soon as [her lawyers] obtained discovery, they give me the paperwork.  I got to know everything about what's going on."[103]

After Biocini mentioned the PDRD footage several times,[104] the City's attorney asked: "You said that you reviewed video of the incident, correct?"  Biocini answered: "Yes."[105]  In November 2015, the family lodged a copy of the video in a court filing.[106]

As the exhibits to court filings bear out, the family took several depositions.[107]  The family deposed three officers, three neighbors, and the medical examiner.[108]  In addition, the family hired experts to examine the evidence.

### D. After Two Settlement Conferences, The Parties Reached An Agreement.

At the first case management conference, the family asked this Court to tag Judge Beeler to guide settlement efforts. [109]  Judge Beeler worked very hard.  She held two

---

[98] Ex. 7, Hall, C.A., et al., *Incidence and outcome of prone positioning following police use of force in a prospective, consecutive cohort of subjects.* J Forensic Leg Med, 2012. 19(2): p. 83-9 (attached to Pereda Decl.).  **Dkt. No. 54.**
[99] Ex. J, Rogers Depo. 11:10-18, 28:1-11.
[100] Pereda Decl. ¶¶ 2-6.  **Dkt. No. 54.**
[101] *Id.;* Ex. S, City's Responses to Doc. Requests (attached to D. Pereda Supp. MSJ Decl.), **Dkt. No. 41-1**
[102] Pereda Decl. ¶¶ 2-6.  **Dkt. No. 54**.
[103] Ex. 2, Biocini Depo 28:2-4 (attached to Pereda Decl.).  **Dkt. No. 54.**
[104] *Id.* at 138:8-10.
[105] *Id.*
[106] *Id.*
[107] *Id.* at ¶ 9.
[108] *Id.*
[109] Pereda Decl. ¶ 7.  **Dkt. No. 54.**

conferences, one on April 15, 2015 and the other on January 8, 2016.[110]    At the first conference, the City expressed its sincere condolences to the family and the parties opened meaningful talks on all issues.[111]    Afterwards, Judge Beeler charted a course toward resolution, pointing out the discovery and dialogue that may help to lead the parties there.[112] Judge Beeler then monitored the parties' progress.[113]

By the second conference, fact discovery was over and the family had produced its experts' reports.   The City's summary judgment motion was fully teed up for a hearing in three days.  Trial loomed less than one month ahead.

Everyone attended.[114]  John Burris and DeWitt Lacy joined their clients, along with a Spanish translator.[115]  Biocini appeared in person.[116]  The remaining family members— including Patricia Jaramillo and Felipe Jaramillo—appeared by video conference.[117]  In the family's own words, "[a]ll Plaintiffs had the ability to hear and see each other during the settlement conference."[118]  "Judge Beeler and Plaintiffs' counsel spoke with Plaintiffs in the [judge's] chambers . . ."[119]

Throughout the day, the Judge Beeler was a conduit for many offers and counters.[120] Judge Beeler thoughtfully explained the facts, risks, and emotions from all viewpoints.[121] The City made a final offer.

The family's lawyers explained the City's offer to their clients, as well as "the specific implications of accepting the offer" and "the finality of the agreement."[122]   "After much discussion," the family "communicated to Burris and Lacy their satisfaction with the terms of

---

[110] **Dkt Nos. 27 and 46.**
[111] Pereda Decl. ¶ 8.  **Dkt. No. 54.**
[112] *Id.*
[113] **Dkt. Nos. 27, 28, 32, 34, and 42.**
[114] Pereda Decl. ¶ 10.  **Dkt. No. 54.**
[115] D. Lacy Decl. ¶¶ 2-3, **Dkt. No. 50.**
[116] *Id.*
[117] *Id.*
[118] *Id.*
[119] *Id.*
[120] Pereda Decl. ¶ 10.  **Dkt. No. 54.**
[121] *Id.*
[122] D. Lacy Decl. ¶ 4.

RESPONSE TO PLAINTIFFS' MOTION TO SET ASIDE SETTLEMENT AGREEMENT (C 14-3315-TEH)

settlement."[123]

The parties then attempted to restate the agreement on the record.[124] "In the courtroom, Judge Beeler described the material terms of the settlement."[125] The City agreed to pay $450,000 in exchange for a full dismissal.[126] Both sides must bear their own fees and costs.[127] The settlement was subject to the City Council's approval.[128]

Judge Beeler "asked Lacy if he had communicated the terms of the settlement to the Plaintiffs. Lacy informed the Court that he had. Judge Beeler then asked if the Plaintiffs who were not present in the courtroom had agreed to the terms of the settlement. Lacy said, 'Yes' Then, Judge Beeler asked Biocini if she agreed to the terms of settlement. Biocini said 'Yes.'"[129] Little did anyone know, the Court's equipment failed.[130] On the next court day, Judge Beeler so advised the parties and had the attorneys restate the agreement on the record.[131] Lacy reaffirmed that he was authorized to bind his clients.[132]

On January 12, 2016, this Court ordered as follows:

> The Parties hereto, by their counsel, having advised the Court that they have agreed to a settlement of this cause,
>
> IT IS HEREBY ORDERED that this cause be dismissed with prejudice; provided, however, that if any party hereto shall certify to this Court, with proof of service of a copy to opposing counsel, within ninety (90) days from the date of this order, that the agreed consideration for said settlement has not been delivered over, the foregoing Order shall stand vacated and this cause shall forthwith be restored to the calendar to be set for trial.[133]

On February 26, 2016, the City delivered payment to the family.[134]

---

[123] *Id.*
[124] *Id.* at ¶ 6.
[125] *Id.*
[126] *Id.*
[127] *Id.*
[128] Pereda Decl. ¶ 10. **Dkt. No. 54.**
[129] D. Lacy Decl. ¶ 6.
[130] Pereda Decl. ¶ 12. **Dkt. No. 54.**
[131] *Id.*
[132] *Id.*
[133] Order of Dismissal (Jan. 12, 2016). **Dkt. No. 48.**
[134] Ex. 1, Copy of Payment, (attached to Pereda Decl.). **Dkt. No. 54.**

**E.    Weeks Later, Biocini Changed Her Mind.**

On January 26, 2016, the Contra Costa Times—an edition of the San Jose Mercury News—ran an online story on the settlement.[135]  The piece embedded links to video footage and to the family's expert's report.[136]  It also claimed that the City never released the footage but that the newspaper "exclusively obtained" a copy from an anonymous source.[137]  Biocini works for the San Jose Mercury News.[138]

Over the next few days, other papers picked up the story.[139]  There is also an online petition—that Biocini purportedly wrote—claiming that "the police hid the tape from the public for TWO AND A HALF YEARS—until it was recently leaked to the media by an anonymous source."[140]

On January 27, 2016, "Biocini called Lacy at his office and informed him of a potential problem with the settlement."[141]  When Lacy "emailed all the family members individually regarding the settlement," four reaffirmed their consent.[142]  But three—Biocini, Patricia Jaramillo, and Felipe Jaramillo—said that "though they voiced a preliminary satisfaction with the settlement amount," they now want to go to trial.[143]

One reason all three give is that they never saw the video footage.[144]  On top of that, Biocini claims that she felt "pressured" by the "will" of her family.[145]  Biocini also feels that she deserves more "consideration" because she seeks to amend the complaint to add an (untimely) NIED claim.[146]

In a letter—not a sworn declaration—Felipe Jaramillo claims that he "could not confirm [his] position" that he did not agree "because the internet connection stopped."[147]

---

[135] Ex. 4, Contra Costa Times article (Jan. 26, 2016); see also Pereda Decl. ¶ 15.  **Dkt. No. 54.**
[136] *Id.*
[137] *Id.*
[138] Ex. 3, Biocini Depo. 10:14-19 (attached to Pereda Decl.).  **Dkt. No. 54.**
[139] Pereda Decl. ¶ 16.  **Dkt. No. 54.**
[140] Ex. 5, *Ana Biocini for Courage Campaign Institute*; see also Pereda Decl. ¶ 17.  **Dkt. No. 54.**
[141] D. Lacy Decl. ¶ 7.
[142] *Id.* at ¶ 7-8.
[143] *Id.* at ¶ 9.
[144] *Id.*
[145] *Id.* at ¶ 10.
[146] *Id.; see also* Reply in Support of Partial MSJ, 7.  **Dkt. No. 41**
[147] F. Jaramillo Letter, ***Dkt. No. 50-1.***

1  Yet at the same time, the family admits that Patricia Jaramillo and Felipe Jaramillo "voiced a
2  preliminary satisfaction with the settlement amount."[148]  And that "Patricia Jaramillo, Felipe
3  Jaramillo, and Maria Claudia Jaramillo communicated to Burris and Lacy their satisfaction
4  with the terms of the settlement, but noted they wanted to hear what their brothers in Bogota
5  had to say about the settlement."[149]  Even if that was a condition, the Bogota brothers say
6  that they agreed and still agree to the settlement.[150]  In other words, the condition was met.

7  Finally, in her own letter, Patricia Jaramillo says that she now wants to go to trial.[151]
8  But she never denies that she assented.[152]

## DISCUSSION

11  The Court dismissed the case with prejudice, unless within ninety days, "the agreed
12  consideration for said settlement has not been delivered over."  The City delivered payment
13  long before the deadline.  The case, then, is dismissed with prejudice.

14  Ignoring that posture, the siblings lean on Cal. Code of Civil Procedure section 664.6.
15  This is misplaced.  Section 664.6 is a tool for a court to enter judgment in line with a
16  settlement agreement.  Cal. C.C.P. § 664.6 (providing that "[i]f parties to pending litigation
17  stipulate . . . orally before the court, for settlement of the case, or part thereof, the court, upon
18  motion, may enter judgment pursuant to the terms of the settlement.")  But that is not the
19  situation at hand.  Instead, there is already a final judgment of dismissal.

20  Because the Court dismissed the case, there is no federal jurisdiction over the siblings'
21  motion to rescind the agreement.  And even if the Court treats the siblings' request as a Rule
22  60 motion to set aside the dismissal, there is no evidence of fraud or extraordinary
23  circumstances that justify ripping apart the agreement and erasing the dismissal.

---

[148] D. Lacy Decl. ¶ 9.
[149] *Id.* at ¶ 4.
[150] *Id.* at ¶ 8.
[151] P. Jaramillo Letter, ***Dkt. No. 50-1***
[152] *Id.*

**I.      THERE IS NO SOURCE OF JURISDICTION.**

Neither the Rules of Civil Procedure nor the ancillary jurisdiction doctrine confers jurisdiction over a motion to enforce a settlement simply because it stems from a case over which the district court once had subject matter jurisdiction. *Kokkanen v. Guardian Life Ins. Co. of America,* 511 US 375, 378 (1995); *Hagestad v. Tragesser*, 49 F.3d 1430, 1432 (9th Cir. 1995). Rather, there must be an independent basis of jurisdiction to enforce the agreement. *Id.* A motion to invalidate a settlement agreement is no different. Without an independent basis of jurisdiction to consider the settlement agreement in the first place, the Court lacks jurisdiction to nullify it.

There is no such source. Once a court dismisses a case because the parties settle, a court retains jurisdiction only if it expressly says so. *Arata v. Nu Skin Int'l, Inc.,* 96 F.3d 1265, 1269 (9th Cir. 1996). It is not enough to note that a dismissal is "'based on' the settlement agreement." *O'Connor v. Colvin*, 70 F.3d 530, 532 (9th Cir. 1995). Here, the Court chose to retain jurisdiction only if the City failed to pay. "Without a violation of the court's order, there is no jurisdiction." *Id.* That has not happened. To the contrary, the City complied with the Court's order, making payment before the deadline. As a result, the Court's jurisdiction is concluded.


**II.      THERE IS NO FRAUD OR MANIFEST INJUSTICE.**

The Ninth Circuit has allowed a settlement-produced dismissal to be set aside where there was fraud or "extraordinary circumstances." *Keeling v. Sheet Metal Workers' Int'l Ass'n*, 937 F.3d 408, 410 (9th Cir. 1991); Wallace Tashima, et al., *Civil Prac. Guide: Fed. Civ. Pro. Before Trial* § 15:141.17 (Rutter Group 2015). State law is the same. *See Folsom v. Butte County Ass'n of Governments,* 32 Cal.3d 668, 677 (1982) (holding that "a valid compromise agreement has many attributes of a judgment, and in the absence of a showing of fraud or undue influence is decisive of the rights of the parties thereto and operates as a bar to the reopening of the original controversy."); *Roth v. Morton's Chef Services, Inc.* 173 Cal.App.3d 380, 387 (1985) (setting aside a settlement where there was a "stark surprise"

1  resulting from an unpredictable change in the conditions underlying the settlement.). Nothing

2  about the settlement in this case in any way suggests fraud or injustice.

3

4  **A.     There Is No Evidence Of Fraud.**

5          Under Rule 60(b)(3), a court may set aside a dismissal where—unlike here—there

6  was "fraud . . . misrepresentation, or misconduct by an opposing party." F. R. Civ. P.

7  60(b)(3). To trigger that statute, a party must prove that a party cooked up a judgment

8  through fraud or misconduct. *In re M/V Peacock on Complaint of Edwards*, 809 F.2d 1403,

9  1404-1405 (9th Cir. 1987). And that such conduct "prevented the . . . party from fully and

10 fairly presenting the case." *Id.*

11

12            **1.     There was no fraud during the settlement conferences.**

13         This settlement came to life in federal court. At the outset of the case, the family

14 asked specifically for Judge Beeler to facilitate settlement. This Court obliged. Over the next

15 year, Judge Beeler held two conferences, identified discovery to help the parties assess the

16 case, and tracked the parties' headway. On the final day, she spent a full day drilling down

17 on all the key issues and terms.

18         The declaration attached to their motion confirms that each siblings attended the final

19 conference and could communicate with one another, the Court, and the lawyers. Burris and

20 Lacy explained the City's final offer to their clients, as well as "the specific implications of

21 accepting the offer" and "the finality of the agreement." "After much discussion," the family

22 "communicated to Burris and Lacy their satisfaction with the terms of settlement." The

23 parties recited the agreement in court—twice. Nothing about any of this spells fraud.

24

25            **2.     The City withheld nothing.**

26         Weeks later, an edition of the San Jose Mercury News—Biocini's employer—ran a

27 story on the settlement. The paper claimed that it exclusively obtained "unreleased" video

28 footage—the same footage that the City produced to the family in December 2014—from an

RESPONSE TO PLAINTIFFS' MOTION TO SET ASIDE SETTLEMENT AGREEMENT (C 14-3315-TEH)

anonymous source. The next day, Biocini called Lacy to complain. When Lacy polled the family, four siblings reaffirmed their assent. Two of them, Patricia Jaramillo and Felipe Jaramillo, said that "though they voiced a preliminary satisfaction with the settlement amount," they now want to go to trial.

These two siblings and Biocini suggest that the City withheld video footage and post-death photographs. That is incorrect. In December 2014, the City produced all its records. In September 2015, Biocini *testified that she had watched the video footage*. In November 2015, the family attached the footage to a court filing.

What is more, the family cross-examined officers, neighbors, and the medical examiner. The family even used the post-death photographs to question one of the officers. The family also hired experts to examine the evidence. In sum, there is no merit to the siblings' claim that they were missing evidence.

### B. There Are No Extraordinary Circumstances.

Finally, "Rule 60(b)(6) has been used sparingly as an equitable remedy to prevent manifest injustice." *U.S. v. Alpine Land & Reservoir Co.*, 984 F.2d 1047, 1049 (9th Cir. 1993). The rule takes hold "only where extraordinary circumstances prevented a party from taking timely action to prevent or correct an erroneous judgment." *Id.* One example is where "the petitioner had been ill, incarcerated, and without counsel for the four years following the judgment." *Id.* (citation omitted). Another, in the settlement context, is "complete frustration" of the agreement or a repudiation by the other side. *Keeling*, 937 F.2d at 410-411.

Rule 60(b)(6) is strong medicine for extreme cases. That is not what we have here. Besides claiming that they were missing evidence, the siblings say that although they voiced their agreement, they still wanted to hear from their brothers in Bogota. They have heard from them. The brothers—Diego Jaramillo and Rafael Jaramillo—agreed to the agreement. Moreover, they stand by it. Another reason that Biocini gives is that she deserves more "consideration" for her "individual claim for Negligent Infliction of Emotional Distress."

That is not an *extraordinary circumstance*. None of this is.

## III. THERE IS A VALID SETTLEMENT AGREEMENT.

For all that, there is a valid settlement agreement. Contract law principles govern the formation of such agreements. *Adams v. Johns-Manville Corp.*, 876 F.2d 702, 704 (9th Cir. 1989). The essential elements are: "(1) parties capable of contracting; (2) their consent; (3) a lawful object; and, (4) a sufficient cause or consideration." Cal. Civ. Code § 1550.

Here, the City made an offer with undisputed material terms. Biocini accepted. Patricia Jaramillo and Felipe Jaramillo did too. At most, Lacy's declaration shows that although the they consented, Patricia Jaramillo and Felipe Jaramillo wanted to hear from their brothers in Bogota. That has happened; the brothers consent.

Further, the family's attorneys twice agreed to the terms of the settlement and confirmed that they were authorized to do so. This alone makes for a binding agreement. *Decanay v. Mendoza*, 573 F.2d 1075, 1078 (9th Cir. 1978) (holding that "[a]ssuming both the power of the attorney to bind his client and the validity of the agreement struck, a litigant can no more repudiate a compromise agreement than he could disown any other binding contractual relationship.); *Moore v. Beaufort County*, 936 F.2d 159, 163 (4th Cir. 1991) (upholding agreement where a party authorized its attorney to settle); *Fennell v. TLB Kent Co. v. TLB Kent*, 865 F.2d 498, 501 (2nd Cir. 1989); *MidSouth Towing Co. v. Har-Win, Inc.* 733 F.2d 386, 389 (5th Cir. 1984); *Larson v. Heritage Square Assocs.* 985 F.2d 1533, 1537 (8th Cir. 1992).

Even if this Court pivots to Section 664.6, the settlement can be summarily enforced. Under that section, "[i]f parties to pending litigation stipulate . . . orally before the court, for settlement of the case, or part thereof, the court, upon motion, may enter judgment pursuant to the terms of the settlement." Cal. C.C.P. § 664.6.

What matters most is the parties' "mature reflection and deliberate assent." *Levy v. Super. Ct.*, 10 Cal.4th 578, 583-585 (1995). "Nothing in the statutory suggests that, in a multi-party action, *all* parties must agree to the settlement *in the same manner*. And as long

as the parties agree to the *same material terms*, be it orally or in writing, the purpose of section 664.6 is satisfied." *Elyaoudayan v. Hoffman*, 104 Cal.App.4th 1421, 1428 (2003).

"The statute does not require that the party to be bound consent to the settlement 'on the record,' only that the party consent to it 'orally before the court.'" *Cahuenga Partners, LLC v. Turmeko Properties, Inc.*, 176 Cal.App.4th 139, 143 (2009). Hence, the state appellate court gave Section 664.6 protection to a settlement where a party assented to an agreement in chambers then left the courthouse before his attorney put it on the record. *Id.* That is precisely the case here. According to Lacy's declaration, Felipe Jaramillo and Patricia Jaramillo communicated their assent in the judge's chambers. Biocini, on the other hand, consented on the record. As a result, Section 664.6 is satisfied.

Finally, if this Court wishes, it may rely on the settlement judge's memory of events. *Wang Laboratories v. Applied Computer Sciences, Inc.* 958 F.2d 355, 359 (Fed. Cir. 1992); *Richardson v. Richardson* 180 Cal.App.3d 91, 97 (1986).

## CONCLUSION

For the foregoing reasons, the City respectfully requests that this Court deny Biocini's motion.

Dated: March 9, 2016              Respectfully submitted,

DAVID PEREDA, Supervising Deputy City Attorney

By: _____

_____
Attorneys for Defendants
CITY OF OAKLAND, OFFICER ANDERSON,
OFFICER NAVARRO, AND OFFICER STOUT